UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-----------------------------x
                              :
FRANK CAMERA, Executor of the :   Civ. No. 3:18CV01595(SALM)
Estate of Patrick Camera      :
                              :
v.                            :
                              :
CARY FRESTON, et al.          :   March 28, 2022
                              :
-----------------------------x

## RULING ON MOTION FOR SUMMARY JUDGMENT [Doc. #98]

Defendants Dr. Cary Freston, Dr. Ricardo Ruiz, Dr. Smyth, Dr. Monica Farinella, and Dr. Syed Naqvi ("defendants") have filed a Motion for Summary Judgment as to the claims remaining in the Amended Complaint filed by plaintiff Frank Camera, Executor of the Estate of Patrick Camera ("plaintiff"). [Doc. #98]. Plaintiff has filed an Objection to defendants' Motion for Summary Judgment [Doc. #107], to which defendants have filed a Reply [Doc. #115]. For the reasons stated below, defendants' Motion for Summary Judgment [**Doc. #98**] is **GRANTED**.

## I.   Background

Plaintiff brings this action against defendants asserting claims for deliberate indifference to serious medical needs in violation of the Eighth and Fourteenth Amendments to the United States Constitution. See generally Doc. #51. Plaintiff proceeds pursuant to an Amended Complaint, the allegations of which relate to the purportedly inadequate medical treatment provided

by defendants to plaintiff's now-deceased brother, Patrick Camera ("Mr. Camera"), while Mr. Camera was housed in Department of Correction ("DOC") facilities. See generally Doc. #51. In relevant part, plaintiff alleges that defendants were deliberately indifferent to Mr. Camera's serious medical needs, causing the diagnosis of Mr. Camera's cancer[1] to be delayed, leading to a poor prognosis, and ultimately to Mr. Camera's untimely death. See generally id.; see also id. at 21, ¶146 ("Mr. Camera had a worse prognosis because of the prolonged delay in treatment he received, ultimately succumbing to his illness on March 9, 2019[.]").

The Amended Complaint alleges separate counts of deliberate indifference against each defendant and seeks an award of monetary damages from each defendant in his or her individual capacity. See generally Doc. #51.[2]

## II.  <u>Legal Standard</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the

---

[1] Although the Amended Complaint alleges that Mr. Camera was diagnosed with nasopharyngeal carcinoma, see generally Doc. #51, there is no dispute that Mr. Camera was actually diagnosed with Sinonasal Undifferentiated Carcinoma. See Doc. #107-1 at 38, ¶117.

[2] The Amended Complaint also asserted claims against former DOC Commissioner Scott Semple and Dr. Johnny Wu. See generally Doc. #51. Plaintiff has since withdrawn his claims against Mr. Semple and Dr. Wu. See Docs. #65, #66, #90, #93.

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists." Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002). The moving party may discharge this burden by "pointing out to the district court ... that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

"In ruling on a motion for summary judgment, the district court may rely on any material that would be admissible or usable at trial." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008) (citation and quotation marks omitted). The Court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citation and quotation marks omitted). "If there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be

denied." <u>Am. Home Assur. Co. v. Hapag Lloyd Container Linie, GmbH</u>, 446 F.3d 313, 315 (2d Cir. 2006) (citation and quotation marks omitted). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 247-48 (1986) (emphases in original).

## III. **Facts**

The Court sets forth only those facts deemed necessary to an understanding of the issues raised in, and decision rendered on, this Motion for Summary Judgment. The following factual summary is based on plaintiff's Amended Complaint [Doc. #51], defendants' Local Rule 56(a)(1) Statement of Material Facts [Doc. #98-1], plaintiff's Local Rule 56(a)(2) Statement of Material Facts [Doc. #107-1], and the accompanying affidavits, depositions and exhibits, to the extent that they are admissible evidence.[3] The following factual summary, therefore, does not represent factual findings of the Court.

---

[3] On February 24, 2022, the undersigned issued a Ruling granting a motion <u>in limine</u> filed by defendants, precluding certain exhibits and arguments submitted by plaintiff in opposition to defendants' motion for summary judgment. <u>See</u> Doc. #121.

A.   <u>Undisputed Material Facts</u>

At all times relevant to the issues raised in this case, Mr. Camera was housed in the custody of the DOC as a sentenced inmate. <u>See</u> Doc. #107-1 at 2, ¶3; <u>see also</u> Doc. #108-39 at 3. Each defendant is, or was, an employee of the DOC and/or the now defunct Correctional Managed Healthcare. <u>See</u> Doc. #107-1 at 2-3, ¶4.

While in DOC custody, Mr. Camera had a documented history of sinus and allergy symptoms dating back to April 15, 1992. <u>See</u> <u>id.</u> at 6-7, ¶22. Mr. Camera's medical records also indicated his long history of nasal irritation, heroin and cocaine abuse, as well as a history of smoking. <u>See</u> <u>id.</u> at 7, ¶24.

On January 23, 2017, Mr. Camera submitted an Inmate Request Form to medical stating: "I've had a sinus infection for over a month, and it seems to be getting worse, a lot of blood coming out of my right sinus. Please call me down." Doc. #108-2 at 8. On January 25, 2017, while housed at Enfield Correctional Institution ("Enfield"), Mr. Camera presented to nursing sick call, where his chief complaint was: "I think I have a sinus infection." Doc. #96 at 234. The nurse who saw Mr. Camera at that visit, Brett Rosenberg, noted that Mr. Camera had a cough with "sinus/nasal pain & congestion[,]" but no thick nasal secretions or fever. <u>Id.</u> at 235 (sic); Doc. #107-1 at 7-8, ¶27.

Nurse Rosenberg gave Mr. Camera a nasal decongestant. See Doc. #107-1 at 7-8, ¶29; Doc #96 at 235.

Mr. Camera next presented to medical on May 5, 2017, complaining of worsening allergies and what felt like a sinus infection. See Doc. #107-1 at 8-9, ¶30.[4] Mr. Camera complained that his ongoing sinus pain and allergies had not been relieved by medications. See id.; see also Doc. #96 at 233. Mr. Camera also reported that he experienced "[b]leeding w[ith] blowing[.]" Doc. #96 at 233. The nurse scheduled Mr. Camera for an appointment with a doctor on May 9, 2017. See id.; Doc. #107-1 at 8-9, ¶30.

In 2017, although stationed at Osborn Correctional Institution, Dr. Cary Freston was the physician assigned to Enfield. See Doc. #107-1 at 9, ¶31. Dr. Freston would travel to Enfield once per week, or once every other week, to provide medical care to the inmates at Enfield. See id. Dr. Freston first treated Mr. Camera on May 9, 2017, when he presented with sinus-related complaints. See id. at 10, ¶¶35-36. During this visit, Mr. Camera reported: "Intermittent blows blood sputum right nose. No fevers. No ear pains." Doc. #96 at 231; see also Doc. #108-4 at 27:2-8 (Dr. Freston testimony clarifying his

---

[4] At this time, Mr. Camera was an outside worker. See Doc. #107-1 at 10, ¶37. His duties included cutting grass and clearing leaves, which exposed him to outside allergens. See id.

notes of this visit).[5] Dr. Freston's examination of Mr. Camera "revealed normal vital signs, no fever, negative lymph nodes, no conjunctive injection (redness in eye), clear nostrils, clear pharynx (throat clear), and normal heart and lung functions." Doc. #107-1 at 11, ¶38 (sic). Mr. Camera's right ear drum, however, was "immobile," indicating there may have been some fluid behind the ear, which is usually caused by congestion and associated with allergies or sinusitis. Id. at 11, ¶39. Dr. Freston concluded that Mr. Camera likely had low-grade chronic sinusitis, prescribed Mr. Camera an antibiotic, and recommended that he take an over-the-counter pain reliever and a decongestant for symptom relief. See id. at 11, ¶40. Dr. Freston directed Mr. Camera to follow-up as needed. See id.

Mr. Camera next presented to Dr. Freston on June 13, 2017, because of a positive PPD test. See id. at 12, ¶43.[6] During this encounter, Mr. Camera reported that he was experiencing intermittent blood sputum on the right side of his nose, which had improved with the antibiotic, but that he was beginning to

---

[5] Citations to deposition transcripts cite to the page number of the transcript and <u>not</u> to the page number contained in the ECF header.

[6] "Plaintiff denies the Defendants' footnote that Mr. Camera did not ultimately have tuberculosis[,]" because "[a] Positive PPD means that the patient has what is called latent tuberculosis infection." Doc. #107-1 at 12, ¶43 (sic). This denial is not material to the Court's decision.

experience some congestion on the date of the examination. See
Doc. #107-1 at 13, ¶44. Dr. Freston's examination of Mr. Camera
revealed "no signs of blood in his nostrils, no polyps or nodes,
normal vital signs, no fever, normal pharynx, and his systems
were otherwise negative[,]" except "his right nasal septum was
... slightly enlarged[.]" Id. at 13, ¶45. Dr. Freston concluded
that Mr. Camera's sinusitis appeared to have been resolved by
the antibiotics prescribed in May, and that Mr. Camera was
experiencing localized nasal congestion, which he treated with a
nasal saline spray. See id. at 13, ¶46. Dr. Freston again
"instructed [Mr. Camera] to follow up as necessary." Id.

Two months later, on August 8, 2017, Dr. Freston saw Mr.
Camera for a pre-scheduled intermittent chronic disease clinic
appointment to address Mr. Camera's hypertension. See id. at 13,
¶47. During this visit, Mr. Camera complained of "possible
sinusitis symptoms in his right sinus, and reported that he had
some blood-tinged sputum, some postnasal drip, some tearing in
his right eye, as well as headaches and jaw pressure on the
right side." Id. at 14, ¶48. Dr. Freston's examination of Mr.
Camera revealed "normal vital signs, no fever, no weight change,
normal heart rhythm, clear lungs, no pain or tenderness on
frontal or maxillary sinus on palpation, no dental pain, ears
were normal, no nodes, no throat discharge (but some redness
noted in throat), and his left nostril was normal, but his right

nostril had some slight redness." Doc. #107-1 at 14, ¶49. Dr.
Freston concluded that Mr. Camera's symptoms might be a
recurrence of low-grade chronic sinusitis. See id. at 14-15,
¶50. Dr. Freston based this conclusion on the fact that Mr.
Camera's prior sinusitis symptoms appeared to have improved in
June 2017 after a round of antibiotics, but had now recurred.
See id. Dr. Freston prescribed Mr. Camera a second, different
antibiotic. See id. at 15, ¶51. He also prescribed Mr. Camera an
anti-allergy medication and a nasal saline spray for symptom
relief. See id.

On September 10, 2017, Mr. Camera submitted an Inmate
Request Form to "Dental" stating that it was his "2nd request.
Again. The right side of my face is swelling with the upper side
of my mouth teeth or tooth causing my right eye to tear and ache
also. Can you please call me down to relief this pain." Doc.
#108-2 at 2 (sic). Out of seven Inmate Request Forms submitted
by Mr. Camera, this is the only one that makes any mention of
pain. See id. at 2-8.

On September 21, 2017, Nurse Rosenberg emailed Dr. Freston
inquiring whether Dr. Freston could see Mr. Camera "for a quick
moment" concerning Mr. Camera's sinus issues and possible
diagnostic imaging. Doc. #107-1 at 18, ¶62; Doc. #108-11 at 1.
The next day, Dr. Freston responded stating that Mr. Camera
should not be seen as an "add-on[,]" but should be added to the

routine medical sick call because Dr. Freston wanted to see him for a full appointment. See id.

On October 5, 2017, Mr. Camera was seen by Dr. James Smyth, an optometrist. See Doc. #107-1 at 15, ¶53; Doc. #96 at 170. Mr. Camera's October 5, 2017, appointment with Dr. Smyth was not pre-scheduled. See Doc. #107-1 at 16, ¶54. Rather, Mr. Camera was already at medical for a dental appointment on that date, and a nurse requested that Dr. Smyth see Mr. Camera because he was an outside worker, making it difficult to schedule daytime appointments. See Doc. #107-1 at 16, ¶54 n.2. Mr. Camera informed Dr. Smyth that he had been seeing Dr. Freston for allergies and a sinus infection. See id. at 16, ¶55. Dr. Smyth performed a routine eye examination, and provided Mr. Camera with a new eyeglasses prescription. See id. at 16-17, ¶56, ¶58. Dr. Smyth testified that during this examination, he did not notice anything out of the ordinary. See id. at 17, ¶59. This was Dr. Smyth's only encounter with Mr. Camera. See id. at 18, ¶60.

Five days later on October 10, 2017, Mr. Camera presented to Dr. Freston with right eye discomfort, intermittent eye pressure, and light sensitivity. See id. at 19, ¶64. Dr. Freston noted that Mr. Camera had an eye examination and molar extraction the prior week. See id. Mr. Camera reported that the antibiotic he received in August had "helped[,] but that he was

now having dull discomfort." Doc. #107-1 at 19, ¶65. During this encounter, Dr. Freston examined Mr. Camera, "which revealed normal vitals, negative percussion," and a clear "nose and pharynx[.]" Id. at 19-20, ¶66. "Dr. Freston also performed a fundi examination of Mr. Camera's eyes, which revealed normal findings other than mild tearing in his right eye[.]" Id. Based on this examination, Dr. Freston assessed "a differential diagnosis of potential relapse of chronic sinusitis vs. intrinsic eye condition vs. dental molar or nasal problem." Doc. #107-1 at 20, ¶67; see also Doc. #96 at 238. Dr. Freston noted: "If patient truly had the amount of discomfort, it is highly unlikely he would cont. to do job, but uncomfortable is more likely appropriate." Doc. #96 at 238 (sic); see also Doc. #107-1 at 20, ¶67.

Based on the October 10, 2017, encounter, Dr. Freston submitted a Utilization Review Committee ("URC") request for a CT scan of Mr. Camera's sinuses and ordered bloodwork to rule out arteritis. See Doc. #107-1 at 21, ¶68; Doc. #96 at 171. The URC request notes an "Initial Diagnosis" of "Sinusitis" and states: "Request CT sinuses and frontal cranium. Ongoing and complex right frontal sinus and face dull pain. Recent optometry and dental treatments appear to not alleviate discomfort, as well as course of antibiotics for sinusitis. Right eye hypersensitivity, and low grade headaches. Labs pending ESR,

etc." Doc. #107-1 at 23-24, ¶78; see also Doc. #96 at 171. The
request was submitted with a "Category 4" priority, meaning
within two months. Doc. #96 at 171; Doc. #107-1 at 24, ¶81.
Plaintiff admits:

> Prescribing an antibiotic for suspected sinusitis is
> appropriate, as the American Academy of Otolaryngology
> guidelines for the treatment of sinus disease describe
> various forms and stages of sinusitis and symptomatic
> treatment with decongestants, irrigations, and over the
> counter pain medications are recommended, and that acute
> bacterial sinusitis is associated with increased
> congestion, pain, purulent drainage and decreased sense
> of smell, at which point patients should receive
> antibiotics.

> The guidelines clearly state that imaging studies,
> including x-rays and CT scans, are not indicated for
> acute bacterial sinusitis and only after two consecutive
> courses of different antibiotics over four weeks fail to
> clear symptoms, would imaging studies be warranted.

Doc. #107-1 at 11-12, ¶¶41-42.

At this point, it is necessary to review the function of the
URC. The URC was a panel of correctional physicians who had
experience providing medical care in a correctional setting. See
id. at 21, ¶69. The URC reviewed requests submitted by facility
physicians for health care referral services ("URC requests")
that were not available at the particular facility where an
inmate was housed. See id. In 2017, the URC met on a regular
basis, usually weekly, to review URC requests. See id. at 21,
¶70. URC meetings were conducted remotely. See id. at 22, ¶72.

At least three members of the URC panel had to be present to
adjudicate a URC request. See id. at 21, ¶71.

URC panel members did not have access to an inmate's medical
records or medical chart. See Doc. #107-1 at 22, ¶72; id. at 23,
¶74.[7] The URC requests were adjudicated based on the information
provided in the request, to which the URC panel members had
access. See id. at 21, ¶70; id. at 22, ¶73. The URC requests
included: "the name of the inmate/patient, his current facility,
the name of the requesting provider, ... information concerning
the procedure, specialty, or referral services requested, the
priority of the request, the suspected diagnosis, as well as an
explanation of the specific services requested[.]" Doc. #107-1
at 22, at ¶73.

At the URC meetings, panel members would review and discuss
each URC request, and then vote on whether to approve the
request based on the information submitted. See id. at 22-23,
¶75. If a denial was based on insufficient information, the
denial would state that. See id. at 23, ¶76. Dr. Monica
Farinella and Dr. Sayed Naqvi were members of the URC in 2017,
but neither recalls reviewing or being involved in the
adjudication of any of the 2017 URC requests regarding Mr.

---

[7] The URC panel members did have access to reports from UConn
Health Center, including lab results and diagnostic imaging. See
Doc. #107-1 at 22, ¶74.

Camera. See id. at 23, ¶77; see also Doc. #110 at 2.[8] Dr. Ruiz
was also a member of the URC during the relevant time period.
See Doc. #110 at 2.[9] On October 18, 2017, the URC, including Dr.
Farinella, Dr. Naqvi, and Dr. Ruiz denied Dr. Freston's request,
and instead recommended obtaining sinus x-rays and pertinent
labs, and resubmitting the request if clinically indicated. See
Doc. #107-1 at 27, ¶85; see also Doc. #96 at 66; Doc. #110 at 2.

On October 24, 2017, Dr. Freston met with Mr. Camera "to
check on his status and discuss the URC's decision." Doc. #107-1
at 28, ¶90. During this encounter, Mr. Camera reported
experiencing headaches and light sensitivity that interfered
with his ability to go outdoors. See id. at 28-29, ¶91. Dr.
Freston "performed a physical examination, which revealed ...
normal vital signs, no fever, no weight loss, normal gait, gross
motor skills were in-tact, and Mr. Camera did not appear in
pain." Id. at 29, ¶93. Based on Mr. Camera's complaints that
photosensitivity was causing his headaches, Dr. Freston believed

---

[8] Defendants do not contest personal involvement.
[9] Dr. Freston's "service on the URC ended in the early part of
2017." Doc. #98-4 at 3. Plaintiff acknowledges that "should he
survive summary judgment, he will have to amend the Complaint
because Kelly Quijano's email (Ex. 35) demonstrates Dr. Freston
was not a member of the URC, and Plaintiff's Amended Complaint
(ECF 51) includes allegations against Dr. Freston as a member of
the URC." Doc. #107 at 27 n.3; see also Doc. #110 at 2. The
Court accordingly dismisses any claims asserted against Dr.
Freston related to his role as a member of the URC and does not
consider any such claims further.

it was necessary to transfer Mr. Camera to an indoor facility to
mitigate the risk of Mr. Camera missing meals and other
appointments. See Doc. #107-1 at 29-30, ¶94.[10] Dr. Freston also
believed, based on Mr. Camera's escalating symptoms at this
visit, that there might be something more than sinusitis at
issue. See id. at 30, ¶96. Following this appointment, Mr.
Camera was cleared for a transfer to an indoor facility, and on
October 24, 2017, he was transferred to Cheshire Correctional
Institution ("Cheshire"). See id. at 31, ¶97.

On October 26, 2017, Mr. Camera presented to the nursing
sick call at Cheshire with the chief complaint of "My head
hurts." Doc. #96 at 241; Doc. #107-1 at 31, ¶99. Mr. Camera
reported nasal congestion and right eye pain. See Doc. #96 at
241-42; Doc. #107-1 at 31-32, ¶99. The nurse's examination of
Mr. Camera noted mild swelling to his right orbital area. See
id. That same day, Mr. Camera was seen by Dr. Ricardo Ruiz. See
Doc. #107-1 at 32, ¶100. At this appointment, "Mr. Camera
presented with nasal congestion, a right frontal headache with
no chills or fever, and some orbital soft tissue swelling." Id.
Dr. Ruiz provided Mr. Camera with Tylenol for pain relief. See
id. at 32, ¶101.

---

[10] Enfield's housing units are in separate buildings that require
an inmate to walk outdoors to access the dining hall, medical,
and other locations. See Doc. #107-1 at 29, ¶94.

Mr. Camera had an initial x-ray of his sinuses on October
27, 2017, which reflected "some hazy density overlying the right
maxillary sinus which is completely evaluated." Doc. #96 at 147.
The final x-ray report stated that it was an "[i]ncomplete
study[]" and "[r]ecommend[ed] upright Waters' view." Id.

On October 30, 2017, Dr. Ruiz ordered the additional sinus
x-ray recommended by the radiologist. See Doc. #107-1 at 32-33,
¶¶101-102; see also Doc. #96 at 22. This x-ray showed a complete
opacification of Mr. Camera's right maxillary sinus, which
plaintiff admits could have been caused by a number of things
from congestion to a soft tissue mass. See Doc. #107-1 at 33,
¶103.

To further assess the opacification, on October 31, 2017,
Dr. Ruiz submitted two URC requests: one for a referral to an
ear, nose, and throat ("ENT") specialist; and the other for a CT
scan. See Doc. #107-1 at 33, ¶104; see also Doc. #96 at 63, 65.[11]
Both URC requests state:

> 53 [year old white male] with complaint of Right facial
> pain with decreased tactile sensation. He states that he
> has had difficulty moving air through his Right nostril.
> He has been treated with various bouts of antibiotics
> without improvement. He has been afebrile. He is not
> diabetic.
>
> HEENT – He is noted to have some mild protrusion of his
> right eye with some peri-orbital swelling. PEERLA, EOMI,

---

[11] Dr. Ruiz also referred Mr. Camera to an optometrist because of
the slight swelling of the soft tissue over his right eye, and
ordered lab testing. See Doc. #107-1 at 34, ¶105.

> denies diplopia. No air movement through his right
> nostril.
>
> Waters x-ray revealed complete opacification of the
> right maxillary sinus. CBC and ESR are normal.
>
> I am requesting an ENT evaluation after the sinus CT
> scan.

Doc. #96 at 63, 65; see also Doc. #107-1 at 34, ¶106. The URC

approved these requests on November 6, 2017. See Doc. #97 at 12-

33.

On November 2, 2017, Dr. Ruiz had a follow-up visit with

Mr. Camera. See Doc. #107-1 at 34, ¶107; see also Doc. #96 at

244. At this visit, Dr. Ruiz told Mr. Camera about the

opacification revealed by the x-ray, and that he had submitted

URC requests for additional follow-up. See id. Dr. Ruiz's

examination of Mr. Camera revealed that that Mr. Camera was of

clear mind and ambulating normally. See Doc. #107-1 at 34-35,

¶108; see also Doc. #96 at 244. Dr. Ruiz also provided Mr.

Camera with Tylenol because Mr. Camera "state[d] this helps."

Doc. #96 at 244; see also Doc. #107-1 at 34-35, ¶108.

On November 21, 2017, a Captain sent Mr. Camera to the

medical department at Cheshire due to a change in mental status.

See Doc. #107-1 at 37, ¶114; see also Doc. #96 at 246-47. An

examination of Mr. Camera revealed left sided weakness and a

headache radiating from Mr. Camera's neck to the top of his

head. See id. At this time, Mr. Camera was taken by ambulance to UConn Health Center. See Doc. #107-1 at 37, ¶114.

At UConn Health Center, Mr. Camera received an emergency CT scan, which showed a large nasal mass that extended into Mr. Camera's left and right orbits, sinuses, and intracranially. See Doc. #107-1 at 37, ¶115. This finding was confirmed the next day by an MRI with contrast. See id. After consultations with both an ENT and neurosurgery, Mr. Camera had an intranasal biopsy that revealed a malignant tumor. See id. at 37, ¶116. The pathology of the tumor was indicative of Sinonasal Undifferentiated Carcinoma ("SNUC"). See id. at 38, ¶118. The tumor "was staged as paranasal sinus cancer level IVB," because the tumor was extensive involving the paranasal sinuses and posterior orbit with significant intracranial extension. Id. There was no evidence of regional lymph node involvement or metastatic disease. See id. Plaintiff admits that even if Mr. Camera's cancer had been detected and diagnosed at an earlier point in 2017, it would, at best, have been stage T3. See Doc. #107-1 at 40, ¶133.

SNUC is a very rare, highly aggressive head and neck tumor. See id. at 3, ¶5. SNUC is so rare that it occurs in only one out of every 5,000,000 people in the population. See id. at 3, ¶8. There have been fewer than 400 documented cases of SNUC described in the world literature. See id. at 3, ¶9. The most

common symptoms of SNUC include: "nasal obstruction, epistaxis, headache, facial pain, periorbital swelling and proptosis[.] Id. at 5, ¶17. Patients with SNUC generally present with symptoms similar to upper respiratory infections and sinusitis, both of which are very common conditions. See id. Each year an estimated 28.9 million people in the United States, or 11.6 percent of the population, suffer from sinusitis. See id. at 5, ¶18.

Head and neck tumors most often begin in areas of the mouth, throat, or larynx. See Doc. #107-1 at 3, ¶6. Only two percent of head and neck tumors are located in the paranasal sinuses. See id. The anatomy of the sinuses allows these tumors to become quite large before detection. See id. at 38, ¶119. These tumors do not become apparent until they have extended beyond the sinuses, making them extremely difficult to diagnose until advanced stages. See id. at 4-5, ¶14. Greater than ninety-five percent of SNUC cases are staged at T3 or T4 when diagnosed. See id. at 4, ¶12. Despite recent advancement in treatment, the prognosis and survival outcomes of patients diagnosed with SNUC is poor. See id. at 5, ¶15.

Following his diagnosis, Mr. Camera received various cancer treatments, and by early Summer 2018 was described as "clinically improving[.]" Id. at 38, ¶121. Mr. Camera continued to show improvement through the Summer and Fall of 2018, with a

nasal endoscopy performed on August 28, 2018, showing "dramatic improvement[.]" Id. at 39, ¶122; see also id. at 39, ¶¶123-27.

On October 18, 2018, Mr. Camera fell from his wheelchair and was readmitted to UConn Health Center. See Doc. #107-1 at 39, ¶128. Thereafter, Mr. Camera suffered a number of complications, and progressively declined until his death in hospice on March 9, 2019. See generally id. at 38-39, ¶¶128-130.

B.    Plaintiff's Other Evidence

Plaintiff has submitted 28 pages of what he deems "Additional Material Facts." Doc. #107-1 at 42-70.[12] Although these "facts" paint a picture of the conditions Mr. Camera faced while incarcerated, the majority are not material to the question that is currently before the Court –- whether these specific defendants were deliberately indifferent to Mr. Camera's serious medical needs. Indeed, the general picture painted of the conditions at the DOC, including the understaffing of medical personnel, is not pled in the Amended Complaint, and is therefore not relevant to the Court's determination in this case.

---

[12] In support of these facts, plaintiff has submitted the deposition testimony of other medical professionals, much of which was taken in connection with other section 1983 litigation brought by plaintiff's counsel. See, e.g., Docs. #108-10, #108-19, #108-20, #108-28, #108-30.

Plaintiff has disclosed two experts, and has submitted their reports and testimony in opposition to defendants' Motion for Summary Judgement. See Docs. #108-5, #108-6, #108-12, #108-13, #108-37. Dr. Homer Venters has completed a "Review of Death of Patrick Camera[.]" Doc. #108-13. In this opinion, Dr. Venters made three separate conclusions, two of which are relevant to the Court's discussion. First, Dr. Venters concluded:

> 1.   Failure to address early signs and symptoms of nasopharyngeal cancer. Health staff repeatedly ignored and failed to address a steady progression of clear symptoms over 9 months until Mr. Camera became so ill that he required hospitalization. The repeated failures of health staff to adequately address Mr. Camera's signs and symptoms of nasal carcinoma represent gross deviations from the standard of care in correctional health which significantly increased the time his cancer progressed and ultimately[.]

Doc. #108-13 at 6 (sic). Dr. Venter's findings in support of this conclusion include: (1) lack of proper documentation; (2) failure to perform basic assessments; (3) Dr. Freston should have referred Mr. Camera to an ENT after the May 2017 encounter; (4) Dr. Freston should have immediately referred Mr. Camera to an ENT following the June 2017 encounter; (5) Dr. Freston was not reviewing or responding to Mr. Camera's medical history; (6) Dr. Freston should have appealed the URC's denial of the CT scan; and (7) Dr. Ruiz's proposed time frame of 2 months on his URC requests was too long. See id. at 6-7.

Dr. Venters also found:

3. Systemic interference of URC with clinical decision making of physicians caring for CT DOC patients. This case raises concerns that the URC panel acts to substitute a nonclinical set of criteria for the clinical requests made by physicians who are treating CT DOC patients. In the case of denying Mr. Camera ENT and CT scan, his six-month history of progressively worsening symptoms should have prompted speedy ENT referral approval by the URC. In addition, their lack of involvement in ensuring that Mr. Camera received a quick CT scan after his initial x-ray of 10/27/17 indicates that the URC acts to block or deny care rather than ensure that patients receive proper and timely care.

Doc. #108-13 at 8. In sum, Dr. Venters concluded:

It is my opinion that the care provided to Mr. Camera represents gross deviations in the standard of care in correctional settings. Furthermore it is my medical opinion that the repeated failures to properly identify and care for Mr. Camera's nasal cancer significantly increased his risk of illness and death from this treatable condition. Finally, it is my opinion that the level of care provided to Mr. Camera reflects gross systematic deficiencies in the level and manner of care provided to patients with serious medical problems.

Id. Dr. Venters stated in an affidavit dated September 24, 2021: "I do not believe that it was the responsibility of the correctional health primary care staff to diagnose the cancer[.] ... But it was their job to pay attention to [Mr. Camera's] ongoing and worsening clinical presentation over many months and ensure that specialists with appropriate training saw and assessed him." Doc. #108-6 at 2.

Dr. Joel Silver authored an "opinion regarding the medical care of Patrick Camera" dated September 5, 2018. Doc. #108-12 at 2. In his report, Dr. Silver stated that SNUC "is a rare, poorly

differentiated, relatively rapidly growing malignancy that arises from the mucosa of the nasal cavity or paranasal sinuses[,]" and that patients "with earlier stage disease have better outcomes[.]" Id. After reviewing Mr. Camera's course of treatment, Dr. Silver opined:

> The standard approach, based on my experience, is that
>
> Failure of multiple oral antibiotic courses – Patients should respond to a second course of appropriate antibiotic therapy within seven days of initiation. Patients who fail a second treatment course should have imaging and be referred for further evaluation[.]
>
> A noncontrast computed tomography (CT) scan is appropriate in the evaluation of treatment-resistant sinusitis to evaluate for anatomic blockage.
>
> ...
>
> In my opinion, it is likely that if the standard of care was followed, and the diagnosis was made at an earlier point that his prognosis would be better and chance of cure would certainly be increased (it is highly unlikely that the clinic stage of the cancer would be lower resulting in overall improvement).

Doc. #108-12 at 3 (sic).

Dr. Silver testified that the treatment for suspected sinusitis would be antibiotics and decongestants, and the standard of care for suspected sinusitis calls for imaging and referral for further evaluation after a patient fails a second course of antibiotics. See Doc. #107-1 at 25-26, ¶83; see also Doc. #108-37 at 68:10-20, 110:21-112:13. Dr. Silver also testified that performing an x-ray of Mr. Camera's sinuses prior

to doing a CT scan did not deviate from the standard of care, although he expressed that in his opinion, imaging should have occurred in May or June 2017. See Doc. #107-1 at 28, ¶88; see also Doc. #108-37 at 93:10-22, 108:10-19, 115:24-116:1.

IV.   **Discussion**

The circumstances of this case are tragic. The question before the Court, however, is not whether there was a tragedy, but rather, whether the alleged deprivation or delay of medical care rises to the level of a constitutional violation. Although the outcome of this case – an untimely death from an extremely rare cancer – is very serious, it does not necessarily mean that there was a constitutional violation. Significant to the Court's discussion in that regard is the timeline of the events pertinent to this litigation, which as previously discussed, span just over nine months. See generally Section III.A., supra. To summarize:

- **January 25, 2017**: Mr. Camera presented to nursing sick call with complaints of a sinus infection, but had no thick nasal secretions or a fever. Mr. Camera was given a nasal decongestant.
- **May 5, 2017**: Mr. Camera presented to nursing sick call with complaints of sinus pain. The nurse scheduled an appointment for Mr. Camera to see a doctor on May 9, 2017.
- **May 9, 2017**: Mr. Camera presented to Dr. Freston for the first time with sinus-related complaints and reports of intermittent blood sputum from his right nostril. An examination was performed. Dr. Freston assessed Mr. Camera with likely low-grade chronic sinusitis, prescribed Mr. Camera an antibiotic, and recommended that he take an over-the-counter pain reliever and a decongestant for symptom relief.

- **June 13, 2017**: Mr. Camera presented to Dr. Freston because of a positive PPD test. At this visit, Mr. Camera reported experiencing intermittent blood sputum on the right side of his nose, which had been improved by the antibiotic. Mr. Camera reported that he was beginning to have congestion. An examination was performed. Dr. Freston concluded that Mr. Camera was experiencing localized nasal congestion.

- **August 8, 2017**: Mr. Camera presented to Dr. Freston for a pre-scheduled intermittent chronic disease clinic. At this visit, he complained of possible sinusitis symptoms in his right sinus; some blood tinged sputum; some postnasal drip; some tearing in his right eye; and right-sided headaches and jaw pressure. An examination was performed. Dr. Freston concluded that Mr. Camera's symptoms might be a recurrence of low-grade chronic sinusitis and prescribed Mr. Camera a second, different antibiotic.

- **October 5, 2017**: Mr. Camera was seen by Dr. Smyth for a routine eye examination.

- **October 10, 2017**: Mr. Camera presented to Dr. Freston with right eye pressure and light sensitivity. He reported that the antibiotic he received in August had worked, but that he was experiencing dull discomfort. An examination was performed. Based on this encounter, Dr. Freston submitted a URC request for a CT scan of Mr. Camera's sinuses and ordered bloodwork.

- **October 18, 2017**: The URC denied Dr. Freston's request, and recommended first obtaining x-rays and labs.

- **October 24, 2017**: Dr. Freston met with Mr. Camera to review the URC's decision. At this appointment, Mr. Camera reported a change in status. An examination was performed. Based on Mr. Camera's report of photosensitivity, Dr. Freston recommended that he be transferred to an indoor facility. Mr. Camera was transferred to Cheshire on that same date.

- **October 26, 2017**: Mr. Camera presented to nursing sick call complaining that his head hurt. On that same day, Mr. Camera saw Dr. Ruiz for the first time. Mr. Camera presented with congestion, a right frontal headache, and some orbital soft tissue swelling. Dr. Ruiz provided Mr. Camera with Tylenol for pain relief.

- **October 27, 2017**: Mr. Camera underwent an x-ray of his sinuses, which recommended obtaining an additional x-ray, namely an "upright Waters' view."

- **October 30, 2017**: Dr. Ruiz requested an additional sinus x-ray, as recommended by the radiologist. This x-ray showed complete opacification of Mr. Camera's right sinus.
- **October 31, 2017**: Dr. Ruiz submitted two URC requests: one for a referral to an ENT specialist; and the other for a CT scan.
- **November 2, 2017**: Dr. Ruiz held a follow-up visit with Mr. Camera to inform him of opacification and next steps. A physical examination was performed which revealed Mr. Camera was of clear mind and ambulating normally. Dr. Ruiz provided Mr. Camera with Tylenol.
- **November 6, 2017**: The URC approved Dr. Ruiz's URC requests for a CT scan and ENT referral.
- **November 21, 2017**: Mr. Camera was taken to UConn Health Center after a change of mental status. Shortly thereafter Mr. Camera was diagnosed with cancer.

This undisputed history is significant for two reasons. First, it demonstrates that each time Mr. Camera asked to be seen by medical, he was promptly treated. Indeed, with each request and subsequent visit, Mr. Camera's medical providers generally escalated the nature of his treatment in some form. Second, Mr. Camera rarely complained. The record refutes plaintiff's contentions that Mr. Camera was in constant debilitating pain over the course of this timeline. Indeed, a URC request dated September 18, 2017, when plaintiff was allegedly in the throes of pain, makes no mention of any such pain and merely states: "Never received a message to go to dental on any day[,] work outside mowing on grounds[.]" Doc. #108-2 at 3. With that history in mind, the Court turns to the parties' arguments.

Defendants assert that the Court should enter summary judgment in their favor because: (1) Mr. Camera was not deprived of adequate medical care and there is no evidence that any defendant was deliberately indifferent; (2) the defendants are entitled to qualified immunity; and (3) plaintiff cannot establish the causation element of his section 1983 claim. See generally Doc. #98-2. Plaintiff contends, in pertinent part, that disputed material facts exist which prevent the entry of summary judgment in any defendant's favor. See generally Doc. #107 at 25-79. Plaintiff also "denies that Defendants ... merit a grant of qualified immunity[.]" Id. at 80. In reply, defendants contend that "plaintiff seemingly misunderstands the defendants' argument concerning the objective prong of the deliberate indifference test, which is that the plaintiff cannot establish that Camera was deprived of adequate medical care as the evidence establishes that Camera was consistently provided with appropriate medical care given his presentation." Doc. #115 at 1. Defendants also assert that "plaintiff has not established that any of the defendants were deliberately indifferent." Id.

Before addressing the parties' arguments, the Court first reviews the law applicable to plaintiff's claims of deliberate indifference.

A.   Applicable Law – Deliberate Indifference

Because Mr. Camera was a sentenced inmate during the time in question, plaintiff's claims are actionable pursuant to the Eighth Amendment. See Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017). The Supreme Court has held that

> deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under §1983.

Estelle v. Gamble, 429 U.S. 97, 104–05 (1976) (citations, quotation marks, and footnotes omitted). "[N]ot every lapse in medical care is a constitutional wrong. Rather, a prison official violates the Eighth Amendment only when two requirements are met." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (citation and quotation marks omitted). The first requirement is objective, while the second is subjective. See id. at 279-80. Under the objective prong, "the alleged deprivation of adequate medical care must be sufficiently serious." Id. at 279 (citation and quotation marks omitted). The subjective prong requires a showing that the defendant "act[ed] with a sufficiently culpable state of mind." Morgan v. Dzurenda,

956 F.3d 84, 89 (2d Cir. 2020) (citation and quotation marks omitted).

### 1.   Objective Element

Under the objective element, a plaintiff must establish both that (1) he was "actually deprived of adequate medical care[,]" and (2) his medical condition was "sufficiently serious[.]" Thomas v. Wolf, 832 F. App'x 90, 92 (2d Cir. 2020) (citation and quotation marks omitted). "[A] prolonged delay in treatment could support an inference of deliberate indifference." Hernandez v. Keane, 341 F.3d 137, 146 (2d Cir. 2003). Where, as here,

> the challenge is to the adequacy of the treatment provided, such as in cases where treatment is alleged to have been delayed or interrupted, the seriousness inquiry focuses on the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract.

Hanrahan v. Mennon, 470 F. App'x 32, 33 (2d Cir. 2012) (citation and quotation marks omitted). "Because the objective component of an Eighth Amendment claim is necessarily contextual and fact-specific, the serious medical need inquiry must be tailored to the specific circumstances of each case." Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003) (citation and quotation marks omitted).

2.   *Subjective Element*

Under the subjective element,

> an inmate must prove that (i) a prison medical care
> provider was aware of facts from which the inference
> could be drawn that the inmate had a serious medical
> need, and (ii) that the medical-care provider actually
> drew that inference. Farmer, 511 U.S. at 837; Chance,
> 143 F.3d at 702-703. The inmate then must establish that
> the provider consciously and intentionally disregarded
> or ignored that serious medical need. Farmer, 511 U.S.
> at 835; Ross v. Giambruno, 112 F.3d 505 (2d Cir. 1997).

Dallio v. Hebert, 678 F. Supp. 2d 35, 61 (N.D.N.Y. 2009). "Mere
disagreement over choice of treatment, or even a claim that
negligence or medical malpractice has occurred, does not create
a constitutional claim." Stevens v. Goord, 535 F. Supp. 2d 373,
384 (S.D.N.Y. 2008). "[T]he mere malpractice of medicine in
prison does not amount to an Eighth Amendment violation."
Harrison v. Barkley, 219 F.3d 132, 139 (2d Cir. 2000). This
includes "a delay in treatment based on a bad diagnosis or
erroneous calculus of risks and costs, or a mistaken decision
not to treat based on an erroneous view that the condition is
benign or trivial[.]" Id.

Likewise, "disagreements over medications, diagnostic
techniques..., forms of treatment, or the need for specialists
or the timing of their intervention, are not adequate grounds
for a Section 1983 claim. These issues implicate medical
judgments and, at worst, negligence amounting to medical
malpractice, but not the Eighth Amendment." Randle v. Alexander,

960 F. Supp. 2d 457, 481 (S.D.N.Y. 2013) (citation and quotation marks omitted) (emphasis added).

> However, medical decisions that are "contrary to accepted medical standards" may exhibit deliberate indifference, because the doctor has "based his decision on something other than sound medical judgment." Verley v. Goord, 2004 WL 526740, at *11 (S.D.N.Y. 2004). In this vein, district courts in this circuit have denied summary judgment where a reasonable jury could conclude that conduct "was a substantial departure from accepted professional judgment and that the evidence of risk was sufficiently obvious to infer the defendants' actual knowledge of a substantial risk to plaintiff." Ruffin v. Deperio, 97 F. Supp. 2d 346, 354 (W.D.N.Y. 2000).

Stevens, 535 F. Supp. 2d at 385.[13]

### B.   Dr. Freston

Plaintiff's claims against Dr. Freston arise from Mr. Camera's medical treatment while at Enfield in 2017. Defendants assert that plaintiff's claims against Dr. Freston "fail because the evidence demonstrates that Dr. Freston provided appropriate medical care, and there is no evidence he was deliberately indifferent." Doc. #98-2 at 16-17. Plaintiff contends that Dr.

---

[13] Throughout his briefing plaintiff fixates on the "standard of care." See, e.g., Doc. #107 at 30, 46, 72-74, 83. That is not the relevant inquiry. Despite what we may hope for in terms of medical care within prisons, the Eighth Amendment simply does not require that an inmate receive the level of care that one may expect in the outside community. See, e.g., Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986) ("The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves. The essential test is one of medical necessity and not one simply of desirability." (citations and quotation marks omitted)). Rather, the Eighth Amendment prohibits deliberate indifference to serious medical needs. It does not prohibit malpractice.

Freston is not entitled to summary judgment because "Mr. Camera presented with an objectively serious medical condition to Dr. Freston multiple times," Doc. #107 at 30, and "material facts exist as to Dr. Freston's approach." Id. at 39. Plaintiff contends that "Dr. Freston failed to act when confronted with objectively serious medical conditions." Id. In reply, defendants assert that "plaintiff has failed to create a genuine dispute of material fact concerning Dr. Freston's entitlement to summary judgment[,]" and "important[ly] ... does not dispute the basic timeline of Camera's care[.]" Doc. #115 at 1.

The Court first considers the objective element of plaintiff's claim. Plaintiff asserts: (1) "The array of symptoms in addition to nosebleeds that Mr. Camera presented rise to the level of objectively serious[;]" Doc. #107 at 30; (2) "A positive PPD test is an objectively serious medical condition[;]" id. at 34; (3) Nurse Rosenberg's September 21, 2017, email evidences "an objectively serious medical condition[;]" id. at 35; (4) Mr. Camera's worsening symptoms on October 10, 2017, established a serious medical condition, see id. at 36-37; and (5) on October 24, 2017, Mr. Camera "presented with sufficiently serious medical conditions to surpass the objective prong of the deliberate indifference test." Id. at 39. Plaintiff focuses on the wrong inquiry. Where, as here, plaintiff alleges harm due to the inadequacy of the treatment

Mr. Camera received, "the seriousness inquiry is narrower. We focus on the alleged inadequate treatment, not the underlying condition alone." Butler v. Furco, 614 F. App'x 21, 22 (2d Cir. 2015) (citation and quotation marks omitted).

The undisputed facts establish that Dr. Freston provided reasonable medical care to Mr. Camera based on his complaints and presentation. Mr. Camera received his first dose of antibiotics in May 2017, reported improvement in June, and then did not present with further symptoms until August, at which time Dr. Freston prescribed a new antibiotic. Mr. Camera reported on October 10, 2017, that the antibiotic had worked, but at that time reported eye discomfort, intermittent eye pressure, and light sensitivity. Following that visit, Dr. Freston submitted a URC request for a CT scan of Mr. Camera's sinuses and ordered bloodwork to rule out arteritis. After the URC denied the request for a CT scan, on October 24, 2017, Dr. Freston met with Mr. Camera to check on his status and discuss the URC's decision. During this encounter, Mr. Camera reported headaches and light sensitivity. Dr. Freston performed a physical examination, which was largely normal. Based on Mr. Camera's complaints of photosensitivity, Dr. Freston believed it was necessary to transfer him to an indoor facility. It was at this time that Dr. Freston first believed, based on Mr. Camera's escalating symptoms, that Mr. Camera might have something other

than sinusitis. Mr. Camera had his first x-ray on October 27, 2017, less than ten days after the URC denied Dr. Freston's request for a CT scan.

The record reflects that Mr. Camera was regularly seen and treated for complaints of sinusitis. Plaintiff's expert, Dr. Silver, testified that the treatment for suspected sinusitis would be antibiotics and decongestants, and the standard of care for suspected sinusitis calls for imaging and referral for further evaluation after a patient fails a second treatment course of antibiotics. See Doc. #107-1 at 25-26, ¶83. Plaintiff admits:

> Prescribing an antibiotic for suspected sinusitis is appropriate, as the American Academy of Otolaryngology guidelines for the treatment of sinus disease describe various forms and stages of sinusitis and symptomatic treatment with decongestants, irrigations, and over the counter pain medications are recommended, and that acute bacterial sinusitis is associated with increased congestion, pain, purulent drainage and decreased sense of smell, at which point patients should receive antibiotics.
>
> The guidelines clearly state that imaging studies, including x-rays and CT scans, are not indicated for acute bacterial sinusitis and only after two consecutive courses of different antibiotics over four weeks fail to clear symptoms, would imaging studies be warranted.

Id. at 11-12, ¶¶41-42; see also Doc. #105-8 at 92:13-25 (Dr. Venter's testimony regarding Dr. Freston's URC request: "It was appropriate to refer him for CT. That is ... a competent or consistent with the standard of care having -- it should have

come earlier, but given in that encounter for that moment, I agree that the -- one of the appropriate -- the appropriate response was to request a CAT scan."). Although plaintiff's experts assert that diagnostic imaging and referral to a specialist should have occurred earlier, those opinions do not create a triable issue of fact because "disagreements over ... the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim." Randle, 960 F. Supp. 2d at 481 (emphases added). Simply, the disagreement here relates to  treatment decisions, including the timing of Dr. Freston's escalation of Mr. Camera's case to the URC. This is not enough to overcome summary judgment. Dr. Freston's actions, including his medical judgment not to order diagnostic imaging until October when Mr. Camera reported continuing symptoms after a second round of antibiotics, do not rise to the level of an Eighth Amendment violation given Mr. Camera's presentation at those times.

The circumstances of this case are remarkably similar to those presented in Barksdale v. Brown, which plaintiff curiously relies on his briefing. See Doc. #107 at 58. In Barksdale, the plaintiff suffered from "recurrent, chronic problems with his sinuses," and asserted a claim for deliberate indifference based on his doctor's "alleged delay in sending [the plaintiff] to an" ENT. Barksdale, No. 12CV03074(SEM), 2014 WL 842498, at *2 (C.D.

Ill. Mar. 4, 2014). In November 2011, the plaintiff had an x-ray
which showed that plaintiff had, like Mr. Camera, "opacification
of the right maxillary sinus." Id. Two months later in January
2012, a CT scan was done which "also showed opacification of the
right maxillary sinus with some ethmoid thickening." Id.
(citation to the record omitted). From late 2011 to early 2012,
the defendant physician "took Plaintiff's complaints seriously,
prescribing erythromycin and sending Plaintiff for an x-ray, CT
scans, and to see an" ENT Id. The Barksdale court concluded:
"Plaintiff has no evidence that Dr. Lochard's approach was
outside the ordinary standard of care, much less deliberately
indifferent." Id. Here too, the evidence reflects that Dr.
Freston took Mr. Camera's complaints seriously, treated those
complaints, and when necessary, escalated Mr. Camera's
treatment. As plaintiff concedes in citing Barksdale, "summary
judgment was appropriate for the doctors." Doc. #107 at 58.

    Nevertheless, even if the Court were to find that Dr.
Freston's treatment was not "adequate," thus satisfying the
objective component of his Eighth Amendment claim, plaintiff has
failed to present evidence that would satisfy the subjective
prong of the Eighth Amendment test.[14] "[A] delay in treatment

---

[14] Plaintiff asserts that "Dr. Freston did not even acknowledge
that a false PPD test indicates a latent tuberculosis." Doc.
#107 at 41. This is not relevant to the Court's determination,
and plaintiff fails to allege how any such failure harmed Mr.

does not violate the constitution unless it involves an act or
failure to act that evinces a conscious disregard of a
substantial risk of serious harm." Thomas v. Nassau Cnty. Corr.
Ctr., 288 F. Supp. 2d 333, 339 (E.D.N.Y. 2003) (citation and
quotation marks omitted). Other than counsel's hyperbolic
assertions, there is no evidence that Dr. Freston deliberately
failed to diagnose Mr. Camera's cancer. Dr. Freston exercised
his medical judgment given the circumstances and statistical
odds confronting him. See Estelle, 429 U.S. at 105–06 (A
"complaint that a physician has been negligent in diagnosing or
treating a medical condition does not state a valid claim of
medical mistreatment under the Eighth Amendment. Medical
malpractice does not become a constitutional violation merely
because the victim is a prisoner."). Indeed, plaintiff's own
expert testified that his review of the medical records did not
indicate "that any physician, physician's assistant or nurse
deliberately sought to harm or deny Mr. Camera medical care[.]"
Doc. #108-37 at 101:10-13.

> While [Dr. Freston's] failure to ... diagnose the ...
> cancer was undoubtedly frustrating and frightening for
> [Mr. Camera], the record simply does not indicate any
> behavior on [Dr. Freston's] part that elevates the
> situation from possible medical malpractice to the level
> of a constitutional violation. [Mr. Camera] received

Camera. Plaintiff's expert, Dr. Venters denied, "to [his]
knowledge" that "the positive PPD or any aspect of any possible
tuberculosis contribute[d] to Mr. Camera's outcome in this
case." Doc. #108-5 at 88:5-8.

> frequent medical care, as his voluminous medical records
> demonstrate.   Medical   staff   prescribed   various
> medications in an attempt to relieve his symptoms. At no
> point [during Dr. Freston's care] was [Mr. Camera] in
> the type of excruciating pain described in <u>McElligott</u>.

<u>Sheils v. Flynn</u>, No. 9:06CV00407(DNH), 2009 WL 2868215, at *18

(N.D.N.Y. Sept. 2, 2009); <u>see also</u> <u>Thomas v. Wright</u>, No.

9:99CV02071(FJS)(GLS), 2002 WL 31309190, at *9 (N.D.N.Y. Oct.

11, 2002) ("This court finds that the record clearly shows that

the defendants were not deliberately indifferent to Thomas'

serious medical needs. Although they may have failed to diagnose

or even detect his cancer, the record does not show that they

did so deliberately. Furthermore, the record does not show that

they disregarded his medical needs. He was seen numerous times

and given various medications to alleviate his pain and

suffering.").

Plaintiff has failed to present evidence that Dr. Freston's

actions were "a substantial departure from accepted professional

judgment and that the evidence of risk was sufficiently obvious

to infer [Dr. Freston's] actual knowledge of a substantial risk

to [Mr. Camera]." <u>Stevens</u>, 535 F. Supp. 2d at 385 (citation and

quotation marks omitted). Accordingly, defendants' Motion for

Summary Judgment as to Dr. Freston is **GRANTED**.

C.   <u>Dr. Smyth</u>

As both plaintiff and defendants acknowledge, the claim

against Dr. Smyth, an optometrist, arises from a single

unscheduled encounter with Mr. Camera on October 5, 2017. See
Doc. #98-2 at 27; Doc. #107 at 50. Defendants assert that
plaintiff cannot maintain his claim against Dr. Smyth because
the evidence establishes that Dr. Smyth provided Mr. Camera
appropriate optometry care, and there is no evidence that Dr.
Smyth was deliberately indifferent. See Doc. #98-2 at 28-29.
Plaintiff contends that Mr. Camera "presented [to Dr. Smyth]
with an objectively serious condition[,]" namely a "bulging,
tearing, swelling right eye[,]" and "contends that the basis for
[Mr. Camera seeing] Dr. Smyth on October 5, 2017 was due to
imminent pain and chronic pain." Doc. #107 at 50-51. Plaintiff
contends that Dr. Smyth ignored this serious condition, and
failed to conduct an adequate examination, including an "an eye
pressure check[, which] ... lead to further delay in diagnosing
[Mr. Camera's] underlying condition, elongating his suffering."
Id. at 55.

Plaintiff has failed to provide evidence sufficient to
support a finding by a reasonable jury that the objective prong
of the deliberate indifference claim against Dr. Smyth has been
satisfied. First, there is no admissible evidence to establish
that on the date in question Mr. Camera complained to Dr. Smyth
of "bulging, tearing, [and] swelling [in his] right eye." Doc.
#107 at 51. Second, even drawing the inference that Mr. Camera
presented with these symptoms, no reasonable jury could conclude

that the alleged inadequate care (i.e., the alleged limited examination and/or failure to provide an eye pressure check) subjected Mr. Camera to a serious risk of harm. Dr. Smyth testified that even if Mr. Camera had presented with such symptoms, he would have referred Mr. Camera to the facility physician, whom Mr. Camera was already seeing. See Doc. #108-9 at 99:8-14, 99:16-19. Indeed, Mr. Camera saw Dr. Freston just five days later on October 10, 2017, at which time he complained of right eye discomfort, on and off eye pressure, and light sensitivity. See Doc. #107-1 at 19, ¶64. After that appointment, Dr. Freston submitted the URC request for a CT scan. See id. at 21, ¶68; Doc. #96 at 171. Plaintiff presents no evidence as to how Dr. Smyth's allegedly deficient examination on October 5, 2017, "lead to further delay in diagnosing [Mr. Camera's] underlying condition, elongating his suffering." Doc. #107 at 55. See, e.g., Butler, 614 F. App'x at 23 (rejecting claim for deliberate indifference where, inter alia, "the record does not establish that Nurse Furco's misrepresentation of Butler's symptoms caused him any harm. In fact, the undisputed medical records show that Butler corrected any misunderstanding and was treated for a headache that day[]").

Even if plaintiff were able to establish the objective element of his claim, no reasonable jury could conclude that Dr. Smyth was, or should have been, aware that Mr. Camera faced a

serious risk of harm from an extremely rare form of cancer. Again, even drawing the inference requested by plaintiff, that Mr. Camera presented with "bulging, tearing, [and] swelling [in Mr. Camera's] right eye[,]" Doc. #107 at 51, Dr. Smyth testified that "most" of these symptoms "could be caused by sinuses or allergies[,]" which is what Mr. Camera told Dr. Smyth he was being treated for by Dr. Freston. Doc. #108-9 at 98:15-21.

Again, plaintiff has failed to establish that Dr. Smyth's actions constitute "a substantial departure from accepted professional judgment and that the evidence of risk was sufficiently obvious to infer [Dr. Smyth's] actual knowledge of a substantial risk to [Mr. Camera]." Stevens, 535 F. Supp. 2d at 385 (citation and quotation marks omitted). There is simply no evidence to support a reasonable jury finding that Dr. Smyth was aware Mr. Camera faced a serious risk of harm from an extremely rare sinonasal cancer and deliberately ignored it. See Beaman v. Unger, 838 F. Supp. 2d 108, 110 (W.D.N.Y. 2011) ("The most that [the plaintiff's] allegations show, however, is that the [defendants] misdiagnosed his injuries, and failed to recognize the severity of those injuries. Such allegations might conceivably show malpractice, but they do not state an Eighth Amendment claim." (citations omitted)).

Accordingly, defendants' Motion for Summary Judgment as to Dr. Smyth is **GRANTED**.

D.   <u>Dr. Ruiz – Medical Treatment</u>

The claim against Dr. Ruiz as a treating physician arises from two encounters with Mr. Camera at Cheshire on October 26, 2017, and November 2, 2017. Defendants assert that plaintiff's "claim must fail because the evidence demonstrates that Dr. Ruiz provided appropriate care and there is no evidence that Dr. Ruiz was deliberately indifferent." Doc. #98-2 at 29. Plaintiff contends that "material facts exist as to the objective and subjective prongs of the deliberate indifference test stemming from Dr. Ruiz's alleged treatment of Pat Camera." Doc. #107 at 57.

With respect to the objective prong, plaintiff contends that "on October 26, [Mr. Camera] continued to manifest objectively serious medical conditions." <u>Id.</u> Plaintiff asks the Court to draw the "inference that someone brought [Mr. Camera] to the medical unit that morning for Dr. Ruiz's urgent and prompt attention[,]" which "cements the objective dire medical condition [Mr. Camera] presented with at the October 26th encounter with Dr. Ruiz." <u>Id.</u> at 58. Plaintiff again focuses on the seriousness of Mr. Camera's condition, which is not the correct inquiry. To reiterate, because plaintiff alleges harm due to the inadequacy of the treatment Mr. Camera received, "the seriousness inquiry is narrower[;]" the focus is "on the alleged inadequate treatment, not the underlying condition alone."

Butler, 614 F. App'x at 22 (citation and quotation marks omitted).

The undisputed facts establish that on October 26, 2017, Mr. Camera was seen by Dr. Ruiz because his head hurt. Mr. Camera presented with nasal congestion, a right frontal headache, some orbital soft tissue swelling, and no chills or fever. Dr. Ruiz provided Mr. Camera with Tylenol for pain relief. On October 27, 2017, plaintiff underwent an initial x-ray of his sinuses, after which the radiologist recommended further imaging. On October 30, 2017, Dr. Ruiz ordered a sinus x-ray as recommended by the radiologist. The additional x-ray showed a complete opacification of Mr. Camera's right maxillary sinus. To further assess the opacification, on October 31, 2017, Dr. Ruiz submitted two URC requests: one for a referral to an ENT specialist; and the other for a CT scan. The URC requests were submitted as a level 4 priority. Dr. Ruiz also referred Mr. Camera to an optometrist because of the mild swelling of the soft tissue over his right eye, and ordered lab testing. On November 2, 2017, Dr. Ruiz had a follow-up visit with Mr. Camera, during which he informed him of the x-ray findings, and the URC requests. Dr. Ruiz performed a physical examination at this visit, and provided Mr. Camera with Tylenol because Mr. Camera "stated this helps." Doc. #96 at 244; see also Doc. #107-1 at 34-35, ¶108.

Based on these undisputed facts, no reasonable jury could conclude that Dr. Ruiz provided Mr. Camera with constitutionally inadequate care. Indeed, after seeing Dr. Ruiz on October 26, plaintiff received his x-ray on October 27. When that x-ay indicated that plaintiff needed additional imaging, Dr. Ruiz ordered such imaging on October 30, and plaintiff received the additional x-ray immediately thereafter. Here, "the record does not show that [Dr. Ruiz] disregarded [Mr. Camera's] medical needs. [Mr. Camera] was seen numerous times and given various medications to alleviate his pain and suffering." Thomas, 2002 WL 31309190, at *9; see also Barksdale, 2014 WL 842498, at *2.

Even if Dr. Ruiz's treatment had failed to satisfy the objective prong of the deliberate indifference test, based on the record, no reasonable jury could conclude that Dr. Ruiz was subjectively indifferent to Mr. Camera's medical needs. In that regard, to the extent plaintiff contends that Dr. Ruiz failed to adequately prioritize the URC requests, the record does not establish that any such delay rises to the level of a constitutional violation. "[A] delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces a conscious disregard of a substantial risk of serious harm." Idowu v. Middleton, No. 12CV01238(LGS), 2013 WL 4780042, at *10 (S.D.N.Y. Aug. 5, 2013) (citation and quotation marks omitted). Plaintiff contends: "The failure to urgently

examine the blockage in Patsy's sinuses constitutes a blatant
disregard for Patsy's health." Doc. #107 at 63. The Court
disagrees. Plaintiff relies on the opinions of his expert
witnesses to establish that Dr. Ruiz failed to submit the URC
requests with the appropriate urgency. See id. at 61. This,
however, amounts to nothing more than a disagreement in medical
judgment, which is insufficient to state a claim for deliberate
indifference. See Kilgore v. Mandeville, No.
2:07CV02485(TLN)(KJN), 2014 WL 710970, at *24 (E.D. Cal. Feb.
21, 2014), ("Plaintiff's disagreement with Dr. Borges' decision
to designate plaintiff's initial, April 17, 2006, referral to
UCD-ENT as 'routine,' amounts to no more than a difference of
opinion between plaintiff and Dr. Borges. As earlier noted, a
difference of opinion between a plaintiff and one of his
physicians concerning appropriate medical care fails to support
an Eighth Amendment claim."), aff'd sub nom. Kilgore v. Kelly,
620 F. App'x 640 (9th Cir. 2015); Idowu, 2013 WL 4780042, at *10
("Plaintiff has not provided evidence to show that Dr. Avanzato
was deliberately indifferent when he scheduled the initial EEG
as 'routine' and subsequently failed to reschedule the EEG
before December 7, 2011. As noted earlier, Plaintiff's claim is
a disagreement with Dr. Avanzato's medical judgment regarding
the urgency of the EEG. Disagreement with medical judgment,
without more, cannot form the basis of a deliberate indifference

claim."); Ayala-Gutierrez v. Jackson, No. 9:14CV00174(KFG), 2021
WL 1176708, at *6 (E.D. Tex. Mar. 2, 2021) (The allegations that
defendant failed to "schedule [plaintiff] for urgent care
referrals instead of a routine referral[]" did not state a claim
for deliberate indifference because such allegations "amount to
a disagreement over the proper course of treatment or mere
negligence and fail to rise [to] the level of egregious
intentional conduct required to satisfy the exacting deliberate
indifference standard."), report and recommendation adopted,
2021 WL 1163713 (Mar. 26, 2021); Troup v. Smith, No.
2:10CV03109(GEB)(AC), 2013 WL 789101, at *6 (E.D. Cal. Mar. 1,
2013) ("Plaintiff first asserts that Dr. Lovett violated his
constitutional rights when Dr. Lovett failed to label the DIP
fusion surgery as 'urgent' rather than 'routine,' which would
have had the effect of immediate medical care for plaintiff's
finger. This argument fails because a prisoner's mere
disagreement with diagnosis or treatment does not support a
claim of deliberate indifference."), report and recommendation
adopted, 2013 WL 1624653 (Apr. 15, 2013).

Given the extremely low chance that the opacification
signaled a malignant tumor, and the evidence establishing that
the opacity could have been caused by a number of things from
congestion to a soft tissue mass, see Doc. #107-1 at 33, ¶103,
plaintiff has failed to present evidence that Dr. Ruiz's actions

were "a substantial departure from accepted professional
judgment and that the evidence of risk was sufficiently obvious
to infer the defendants' actual knowledge of a substantial risk
to [Mr. Camera]." Stevens, 535 F. Supp. 2d at 385 (citation and
quotation marks omitted). As plaintiff states: "Dr. Ruiz's job
was not to find an answer, but to be alert for red flag symptoms
and escalate them." Doc. #107-1 at 35-36, ¶109. That is
precisely what Dr. Ruiz did by requesting the CT scan and
specialist referrals. There is simply no relevant, admissible,
evidence to support a finding by a reasonable jury that the URC
request "was made with the requisite mental state —
i.e., something more than mere negligence, akin to criminal
recklessness. Negligent errors are not actionable as deliberate
indifference to medical needs under the Eighth Amendment."
Butler, 614 F. App'x at 23.

Additionally, there was ultimately just a three-week delay
between the time Dr. Ruiz submitted the URC request and when Mr.
Camera received a CT scan. Plaintiff admits that Mr. Camera's
cancer, which was ultimately discovered at Stage 4, would likely
have already been Stage 4 had it been discovered in August of
2017. See Doc. #107-1 at 15, ¶52. Although plaintiff asks the
Court to draw the inference that Mr. Camera was in "immense
emotional and physical pain during those three weeks[,]" Doc.
#107 at 63, there is no evidence to support such an inference.

Indeed, as of November 2, 2017, Mr. Camera reported that Tylenol helped relieve his symptoms, and Dr. Ruiz provided him with that medication. <u>See</u> Doc. #107-1 at 34-35, ¶108. During this limited three-week period, Mr. Camera did not submit any Inmate Request Forms requesting to be seen by medical or for additional pain medication. <u>See</u> Doc. #108-2. There simply is no evidence to support the inference that Mr. Camera was in "immense emotional and physical pain" for the entirety of those three weeks.

Accordingly, the Court **GRANTS** defendants' motion for summary judgment as to Dr. Ruiz with respect to the claims asserted against him in his capacity as a medical provider.

E.   <u>URC Physicians – Dr. Farinella, Dr. Naqvi, and Dr. Ruiz</u>

Plaintiff asserts that defendants Dr. Farinella, Dr. Naqvi, and Dr. Ruiz were deliberately indifferent to Mr. Camera's serious medical needs in their role as URC panel members. <u>See generally</u> Doc. #51 at 25-31. In his opposition, plaintiff asserts claims against the URC defendants based on two separate URC denials: the first related to the CT scan requested by Dr. Freston in October 2017; and the second related to a "request seeking approval for physical therapy" following Mr. Camera's discharge from CMHC in January 2018. Doc. #51 at 51, ¶155; <u>see also</u> Doc. #107 at 63-79. Defendants do not address the physical therapy denial in their motion for summary judgment, and in

reply assert that "this claim was not plead in the amended complaint and is not part of this case." Doc. #115 at 9 (sic). Accordingly, the Court first considers the allegations of the Amended Complaint before determining the merits of the URC-related claims.

The Amended Complaint asserts that the URC defendants were deliberately indifferent by "refus[ing] to provide Mr. Camera with an outside ENT consult in June 2017, or a CAT scan." Doc. #51 at 25, ¶178; see also id. at 28-30. Although the Amended Complaint makes a factual allegation regarding the denial of physical therapy in 2018, the Amended Complaint does not actually assert an Eighth Amendment claim related to that allegation. See id. at 22, ¶156. Plaintiff acknowledges the problems with this allegation in a footnote: "The counts relating to the URC's denial of physical therapy specifically appear in all counts against all URC defendants through incorporation of the facts, and appear specifically plead against Dr. Ruiz in ¶178. Plaintiff needs to amend the complaint, for this, and additional reasons, as briefed above." Doc. #107 at 76 n.18. A plain reading of the Amended Complaint entirely refutes the assertion that the URC's denial of physical therapy has been incorporated by reference into the counts as pled. First, the paragraph referred to by plaintiff, number 178, specifically refers to the URC's denial of the CT scan and ENT

referral, and does not refer to physical therapy. See Doc. #51 at 55, ¶178. Indeed, that specific paragraph doesn't even name Dr. Ruiz, but in what appears to be a typographical error, names Dr. Freston. See id. Nevertheless, the allegations asserted against the URC defendants specifically refer to the CT scan, and not to physical therapy. See Doc. #51 at 27-32, ¶¶196-202, ¶¶205-07, ¶¶211-17, ¶¶220-22. Additionally, the Amended Complaint asserts:

> Defendant Dr. Naqvi violated [Mr. Camera's] rights under the Eighth and Fourteenth Amendments to the United States Constitution to adequate medical care, to adequately trained staff, and to protection from harm by substantially departing from the accepted standards of care in the care and treatment of ... Patrick Camera resulting in his Stage [four cancer].

Id. at 31-32, ¶222; see also id. at 26, ¶182 (same assertion as to Dr. Ruiz); id. at 29, ¶207 (same assertion as to defendant Farinella). Based on the face of the Amended Complaint, there is simply no basis on which to read, or even infer, that plaintiff asserts any claim arising after Mr. Camera's cancer diagnosis against the URC defendants. Plaintiff "cannot amend his complaint in his memorandum in response to defendants' motion for summary judgment." Auguste v. Dep't of Corr., 424 F. Supp. 2d 363, 368 (D. Conn. 2006). Accordingly, the Court will not consider the claim related to the denial of physical therapy.[15]

---

[15] Even if plaintiff had properly asserted such a claim, this again amounts to nothing more than a disagreement regarding

With respect to the 2017 URC denial of the CT scan request, defendants contend that: (1) plaintiff cannot establish the objective prong because Mr. Camera was not deprived of adequate medical care, and the URC's decision on this request was reasonable, see Doc. #98-2 at 35; and (2) plaintiff cannot establish the subjective prong because there is "no evidence to establish that ... defendants were aware that Mr. Camera faced a serious risk of harm from a medical condition[] ... and ignored it." Id. at 36. Plaintiff asserts that there are issues of material fact which prevent the entry of summary judgment. See Doc. #107 at 70-76. Defendants reply that plaintiff "has failed to create any genuine dispute of material fact as to the URC defendants' entitlement to summary judgment[,]" because plaintiff "concedes that the URC's denial of the October 10th URC request for a CT scan, and instead recommending x-rays and pertinent labs be completed first, did not deviate from the standard of care." Doc. #115 at 10; see also Doc. #107-1 at 28, ¶¶88-89.

---

treatment, which does not give rise to an Eighth Amendment claim. Indeed, several doctors testified that given Mr. Camera's prognosis at the time, the URC's recommendation that he ambulate with assistance three times per day was reasonable. See Doc. #108-32 at 52:6-53:12 (Dr. Breton Testimony); Doc. #108-37 at 51:18-25 (Dr. Silver Testimony); Doc. #108-36 at 93:5-94:25 (Dr. Farinella Testimony).

Because plaintiff has admitted that the denial of the CT scan did not deviate from the standard of care, to which his own expert testified, plaintiff fails to establish the objective prong with respect to the URC members. Further, any difference between first pursuing a CT scan or an x-ray amounts to a mere difference in opinion, which is not actionable under the Eighth Amendment. See, e.g., Gaines v. Wright, No. 3:17CV01513(VLB), 2017 WL 4694168, at *7 (D. Conn. Oct. 19, 2017) ("Drs. Ruiz, Farinella, Freston and Naqvi constitute the URC. The URC initially denied the request for MRI. This decision is a disagreement over treatment which does not constitute deliberate indifference to a serious medical need.").

Additionally, plaintiff fails to present any relevant or admissible evidence that the URC physicians were aware that Mr. Camera faced a serious risk of harm from an extremely rare sinonasal cancer and deliberately ignored it. Accordingly, the Court **GRANTS** summary judgment in favor of the URC defendants Dr. Ruiz, Dr. Farinella, and Dr. Naqvi.[16]

In light of the foregoing, the Court does not reach defendants' remaining arguments. However, it bears noting that

---

[16] Plaintiff asserts many facts regarding the URC that are not material to the Court's determination. What is material to the Court's determination is whether these specific URC defendants were deliberately indifferent to Mr. Camera's serious medical needs with respect to the October 10, 2017, URC request.

even if there were any substance to plaintiff's Eighth Amendment claims, the opinions of the purported "dueling experts[,]" Doc. #107 at 29 (citation and quotation marks omitted), suggest that defendants could not possibly have known, as a matter of established law, that their actions violated a clearly established constitutional right. See, e.g., Mara v. Rilling, 921 F.3d 48, 68-69 (2d Cir. 2019) ("For law to be clearly established[] ... precedent must have spoken with sufficient clarity to have placed the constitutional question at issue beyond debate. Specifically, the law must be so clearly established with respect to the particular conduct and the specific context at issue that every reasonable official would have understood that his conduct was unlawful." (citation and quotation marks omitted)). As such, even if plaintiff had succeeded in his substantive claims, defendants would be entitled to qualified immunity.

## V.   **Conclusion**

For the reasons stated, defendants' Motion for Summary Judgment [**Doc. #98**] is **GRANTED**.

It is so ordered this 28th day of March, 2022, at New Haven, Connecticut.

_____/s/_____
SARAH A. L. MERRIAM
UNITED STATES DISTRICT JUDGE